UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOAN NEBEL,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>OAKTON COMMUNITY COLLEGE,<br><br>　　　　　Defendant. | No.<br><br>Judge<br><br>Magistrate Judge<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff JOAN NEBEL ("Ms. Nebel"), by and through her attorneys, Fayerman Law, LLC, for her Complaint, complains against Defendant OAKTON COMMUNITY COLLEGE ("OCC" or the "College") as follows:

### NATURE OF ACTION

1.　This is a retaliation action brought under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000 *et seq.*, and an Illinois common law claim of defamation *per se* by a former Sergeant, Public Safety, of Oakton Community College.

### JURISDICTION AND VENUE

2.　This court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. This court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3.　Venue is proper under 29 U.S.C. § 139(b)(2) because a substantial part of the conduct giving rise to the claims took part in this judicial district.

## PARTIES

4. Plaintiff Joan Nebel is a citizen of the United States. She worked for Defendant Oakton Community College from 2002 until she received notice of her termination on or about June 2, 2015. Her final job title was Sergeant, Public Safety. Throughout her employment, Ms. Nebel was an "employee" within the meaning of Title VII and Illinois common law.

5. Defendant Oakton Community College is an educational institution that maintains its principal place of business in Des Plaines, Illinois within this judicial district at 1600 E. Golf Road, Des Plaines, Illinois 60016. It is a community college that employs over 1000 people. Throughout the relevant time, OCC was an "employer" within the meaning of Title VII and Illinois Common Law.

## FACTS

**Ms. Nebel's Excellent Employment History**

6. Ms. Nebel earned her Bachelor of Arts degree in Criminal Social Justice from Lewis University in 2003 and earned her Master of Science in Public Safety Administration from Lewis University in 2008. She also attended the Northwestern Staff and Command, Class 363 in November 2014, in which she earned a final grade of 96%.

7. Ms. Nebel began working for OCC in 2002 as a Public Safety Officer.

8. Throughout her employment, Ms. Nebel always performed her job well.

9. In 2006, Ms. Nebel was promoted to Sergeant, Public Safety in the OCC Department of Public Safety ("DPS").

10. As Sergeant, Ms. Nebel initially reported to Chief Dennis Nolan and then later to Acting Chief George Carpenter ("Carpenter").

11. During the relevant time, Ms. Nebel was in charge of the DPS afternoon shift while Carpenter was in charge of the all-male morning shift.

12. During the relevant time, Ms. Nebel also served as an Adjunct Professor of Law Enforcement at OCC.

13. Prior to Ms. Nebel's engaging in statutorily protected activity in 2014, OCC consistently rated her as an exemplary employee throughout her employment.

14. Since 2003, Ms. Nebel received outstanding performance reviews, including her last one dated May 22, 2014 (her last performance review before her engagement in statutorily protected activity).

15. In her May 22, 2014 review, Carpenter awarded Ms. Nebel the highest possible rating available, which is "Consistently Meets and Sometimes Exceeds Performance Standards."

16. Carpenter's many compliments about Ms. Nebel in her May 22, 2014 review included the following: "I've seen high quality work from a conscientious leader who appears committed to continuous personal and organizational improvement;" "[S]he is an approachable leader and students are willing to speak with her confidentially about both school-related and personal matters;" "[Joan] is the best known Public Safety Officer and foremost ambassador for the department both on and off campus;" and "Sgt. Nebel effectively leads and motivates her shift (the second shift) by providing the necessary training through shift briefing and during the shift, by recognizing excellent performance of her personnel, holding shift personnel accountable for high standards of performance, and by transmitting the College's values of integrity, professionalism, and respect for all people."

**Ms. Nebel Engages in Statutorily Protected Activity When She Complains About Systemic Gender Discrimination in the DPS at OCC**

17. On or about October 3, 2014, female student cadet Monica Owca ("Ms. Owca"), whom Ms. Nebel supervised, filed a Title IX complaint against Carpenter for gender discrimination after he had commented on Ms. Owca's "gorgeous eyes," a comment that she believed was offensive and unwelcome.

18. In response to her complaint, OCC asked Ms. Owca to either change shifts or to work on the Skokie campus while her complaint was being investigated. Ms. Owca refused, claiming that she was the victim and that she should not have to leave.

19. OCC subsequently retaliated against Ms. Owca by passing her over two times for officers' openings and instead awarding those positions to males who did not complain about gender discrimination.

20. After Ms. Owca advised Ms. Nebel of her complaint, Ms. Nebel (as Sergeant) was obligated by law to inform Michael Anthony, OCC's Assistant Vice President, Access, Equity, and Diversity as well as the Title IX Coordinator, of Ms. Owca's complaint against Carpenter. Ms. Nebel did so on or about October 5, 2014.

21. On or about October 28, 2014, Officer Lisa Scandora ("Ms. Scandora"), whom Ms. Nebel also supervised, filed a complaint for hostile work environment and gender discrimination in the DPS, alleging that similarly situated men in the DPS were treated more favorably than similarly situated women.

22. Carpenter and OCC retaliated against both Ms. Owca and Ms. Scandora for engaging in statutorily protected activity. The OCC subjected Ms. Owca to undue scrutiny that it did not also give to similarly situated males who did not complain.

4

23. Similarly, the OCC fired Ms. Scandora without any warning and without any input from Ms. Nebel, her immediate supervisor. Following the termination, Carpenter violated a non-disparagement agreement with Ms. Scandora by telling a potential employer that she was a useless employee, that he was happy to be rid of her, that she was a troublemaker, and that she was a deficit to the DPS.

24. After Ms. Scandora's termination, Ms. Nebel was the only remaining female employee in the DPS.

25. On or about February 20, 2015, OCC's Executive Director of Human Resources Mum Martens interviewed Ms. Nebel as part of OCC's investigation of Ms. Owca's and Ms. Scandora's allegations of gender discrimination.

26. When asked whether she thought Carpenter treated women differently than males, Ms. Nebel answered in the affirmative.

27. Explaining further, Ms. Nebel informed Ms. Martens of multiple instances of gender discrimination within the Department.

28. Ms. Nebel stated that Carpenter did not support decisions made by females in the DPS or allow their input into the needs of the DPS, whereas he did so with males.

29. In addition, Ms. Nebel stated that Ms. Scandora was not given the opportunity to attend a field officer training class even though she was the most qualified candidate and Ms. Nebel had recommended that Ms. Scandora be allowed to attend. In general, each time Ms. Nebel would recommend a female candidate for training opportunities, Carpenter would say no.

30. During the interview with Ms. Martens, Ms. Nebel also described an incident occurring on or about June 28, 2014 when she was the acting Chief of Police for DPS and Officer Gerry Modory ("Modory") acted insubordinately. On or about June 30, 2014, Ms. Nebel

informed Carpenter of Modory's misconduct and stated that he should be written up for insubordination, including not answering his phone and hanging up the phone on his direct supervisor. Carpenter refused to reprimand Modory and Ms. Nebel believes that the only reason that Carpenter refused to support her in this matter was because she is female.

31. Ms. Nebel further explained to Ms. Martens that in July 2014, shortly after the incident with Modory, Ms. Scandora was in training assigned to him and asked him whether Ms. Nebel had sent him an email her LEADS login number. Modory responded with a comment to the effect of, "that bitch wants me to do those LEADS log-in's and I'm not going to listen to a word she says. I don't like her and I'm never going to respect her." Again, Carpenter did not discipline Modory and Ms. Nebel believes that he refused to support her because she is female.

32. Ms. Nebel further informed Ms. Martens that on or about September 9, 2014, Ms. Nebel told Carpenter that the all-male officers on the day shift, under his supervision, were engaging in conduct which created a hostile work environment towards the females on the afternoon shift. This conduct included making derogatory remarks about Ms. Nebel and Ms. Scandora, such as humming the "Imperial March" song when they saw Ms. Nebel on camera coming into the office and saying "101 Alert" (referring to Ms. Nebel's star number) across the radio.

33. Ms. Nebel advised Ms. Martens that she had informed Carpenter that this negative and disparate treatment was unacceptable. Carpenter took no action and the hostile work environment persisted.

34. Ms. Nebel further advised Ms. Martens that in January 2015, Carpenter objected to Ms. Nebel's giving permission to Ms. Owca to drive the police vehicle because she was

training a new cadet and the temperature was below zero. However, male candidates had been permitted to drive the squad car in the past under similar conditions.

35. Ms. Nebel also shared with Ms. Martens that when she asked a subordinate officer to do her a favor and retrieve an item from her vehicle, she was scolded by Carpenter and threatened with a Union grievance. By contrast, when male officers would ask a subordinate to do favors for them, including retrieving items from their vehicles, this was never a problem.

36. The examples of gender discrimination provided by Ms. Nebel are consistent with systemic gender discrimination in the OCC DPS. Significantly, Ms. Nebel was the only female in the DPS until May 2014, when Ms. Scandora was hired. Further, OCC failed to promote Ms. Nebel to Chief in January 2014 when then-Chief Dennis Nolan notified OCC of his retirement.

37. Ms. Nebel had been more than qualified to be promoted to Chief, with 12 years of outstanding service to OCC, 24 years of police experience, an excellent reputation, solid performance evaluations, and a Master's Degree in Public Safety Administration. Instead of promoting Ms. Nebel, OCC secretly hired Carpenter (who was not as qualified as Ms. Nebel since he lacked extensive knowledge of OCC) from the outside to serve as Acting Chief. This decision was made without Ms. Nebel's knowledge even though she was second in command in the department.

**Ms. Nebel Suffers an Adverse Employment Action in Retaliation for her Complaints About Gender Discrimination**

38. Ms. Nebel suffered an adverse employment action when she was terminated by OCC on or about June 2, 2015.

39. Ms. Nebel's termination followed a "formal investigation" that OCC initiated against her only after her February 20, 2015 interview with Ms. Martens in which she supported

7

Ms. Owca's and Ms. Scandora's allegations of gender discrimination and raised allegations of gender discrimination of her own.

40. OCC informed Ms. Nebel that the "formal investigation" against her was pursuant to the Uniform Peace Officers Disciplinary Act, 50 ILCS 725/1 (the "Act"). Under Section 2(c) of the Act, a "formal investigation" is ordered by a "*commanding officer*" during which the questioning of an officer is intended to gather evidence of misconduct which may be the basis for filing charges seeking his or her removal, discharge, or suspension in excess of 3 days." (Emphasis added).

41. As the "commanding officer" was Carpenter, there is no question that the "formal investigation" was ordered by him and was purely retaliatory.

42. Other than by terminating her, OCC had also retaliated against Ms. Nebel in other ways for complaining about gender discrimination.

43. In or about March 2015, Carpenter retaliated against Ms. Nebel by ordering her to do patrol work, conduct traffic stops, and write tickets, even though these activities had not been expected of her for the past 12 years. These are the roles of a patrol officer, and not of Sergeant, who is supposed to be inside the office handling all of the complaints and concerns of the DPS.

44. In addition, Carpenter ensured that Ms. Nebel's afternoon shift was consistently short-staffed, whereas Carpenter's all-male day shift was never short-staffed.

**There is a Causal Link Between Ms. Nebel's Protected Activity and her Adverse Employment Actions**

45. There is a causal link between Ms. Nebel's engaging in statutorily protected activity and her termination.

46. It defies credulity to believe that Ms. Nebel could go from being an outstanding employee for 12 years to one who is allegedly dishonest, unprofessional, and insubordinate, all

8

according to the "formal investigation" which was initiated shortly after she engaged in protected activity.

47. As part of this "formal investigation," Ms. Nebel was interviewed by Ms. Martens and an attorney for OCC on or about May 5, 2015 (the "May 5 Investigation").

48. Many of the alleged incidents raised during the May 5 Investigation supposedly occurred during or prior to 2014, but no one ever brought these problems to Ms. Nebel's attention prior to the May 5 Investigation.

49. Moreover, in spite of OCC's Progressive Discipline Policy (the "Policy"), Ms. Nebel never received counseling about any of these alleged performance problems.

50. Although the Policy provides for counseling, verbal warning, written warning, suspension, and then dismissal, OCC did not follow any of these intermediate steps and instead immediately terminated Ms. Nebel.

51. The May 5 Investigation culminated in a notice of termination from OCC to Ms. Nebel on or about June 2, 2015 (the "June 2 Notice").

52. The June 2 Notice contains numerous false statements and other erroneous material in an effort to establish pretextual grounds for her termination.

53. Moreover, the June 2 Notice indicates contains statements attributed to several employees whom Ms. Nebel later became aware that OCC never actually interviewed.

54. In light of the above, Ms. Nebel believes that OCC terminated her employment as a result of her engaging in the protected activity outlined above.

55. As a result of her termination from the DPS, Ms. Nebel also lost her position as an Adjunct Professor at OCC, further compounding her financial loss.

56. As a result of OCC's actions as described above, Ms. Nebel has suffered and continues to suffer economic damages as well as emotional distress.

**OCC Defames Ms. Nebel**

57. Following Ms. Nebel's termination, OCC put up copies of the flyer attached hereto as Exhibit A.

58. The flyer is a supposed advertisement for a seminar entitled "Problem Employees and the Games They Play."

59. Right next to the title of the seminar is a photograph of Ms. Nebel.

60. The flyer also contains a photograph of a male former employee who was terminated approximately one year before Ms. Nebel and who also sued OCC.

61. According to the flyer, the seminar would help attendees "learn what games are actually being played and why problem employees are motivated to play these games," with a special emphasis on "addressing gossip and rumors."

62. Ms. Nebel's photograph juxtaposed with the seminar's title of "dealing with problem employees" who engage in "gossip and rumors" intentionally created the impression that Ms. Nebel was herself a "problem employee" who engaged in these actions.

63. The "gossip and rumors" as stated in the flyer presumably relate to Ms. Nebel's protected activity of making OCC aware of systemic gender discrimination in the DPS.

64. Even though the supposed date of the "problem employee" seminar was November 17, 2015, as of the date of the filing of this Complaint, OCC still had copies of this flyer posted in multiple locations.

65. As of the date of this Complaint, OCC had copies of the flyer posted in multiple publicly-accessible areas, such as in the patrol, sergeant's, and interview rooms.

66. In this manner, OCC published (and continues to publish) the flyer to all employees of the DPS as well as other employees and students of OCC.

67. There is no purpose for the continuing posting of the flyer other than to defame, embarrass, and humiliate Ms. Nebel.

68. OCC knew that the flyer's statements and implications that Ms. Nebel was a "problem employee" who had engaged in "gossip and rumors" were false.

69. OCC posted (and continues to post) the flyer with actual malice and/or reckless disregard of Ms. Nebel's rights to be free from defamation.

70. The flyer imputes an inability to perform or want of integrity in the discharge of duties of one's office or employment.

71. As a direct and proximate result of OCC's conduct, Ms. Nebel's reputation was destroyed in the area and has contributed to her continuing period of unemployment.

72. Further, Ms. Nebel has been humiliated and has suffered financial loss.

## COUNT I – RETALIATION IN VIOLATION OF TITLE VII

73. Plaintiff reincorporates and re-alleges the allegations in paragraphs 1 through 72 as if fully set forth herein.

74. Ms. Nebel filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

75. On or about February 18, 2016, the EEOC issued Ms. Nebel a Notice of Right to Sue, which is attached hereto as Exhibit B.

76. Ms. Nebel engaged in protected activity by, among other things, bringing the gender discrimination complaints of her subordinate employees to the attention of her superiors

11

and advising OCC of systemic gender discrimination and a hostile work environment in the DPS, including gender discrimination against her.

77. Ms. Nebel reasonably believed that the actions about which she complained constituted unlawful gender discrimination and/or a hostile work environment.

78. Ms. Nebel suffered an adverse action when she was terminated from her position as a Sergeant with OCC on or about June 2, 2015 (and subsequently from her position as an adjunct professor).

79. There is a causal connection between Ms. Nebel's protected activity and OCC's subsequent adverse actions against her.

80. OCC intentionally and maliciously retaliated against Ms. Nebel because she engaged in protected activity.

81. As a result of OCC's retaliation against her, Ms. Nebel has suffered and continues to suffer loss of income and benefits, emotional distress, and has been required to retain an attorney.

**WHEREFORE**, Ms. Nebel requests judgment in her favor and that:

a. OCC be adjudicated and declared to have violated Title VII;

b. An injunction be entered enjoining any further violations of Title VII by OCC;

c. Ms. Nebel be reinstated and/or awarded other appropriate equitable relief, such as front pay;

d. Ms. Nebel be awarded make-whole relief including for lost wages and benefits and any other appropriate relief to which she is entitled;

e. Ms. Nebel be awarded compensatory damages in an appropriate amount and as allowed by law;

f.  Ms. Nebel be awarded punitive damages in an appropriate amount and as allowed by law;

g.  Ms. Nebel be awarded pre-judgment interest on the above damages;

h.  Ms. Nebel be awarded her reasonable attorneys' fees, costs, and litigation expenses (including expert witness fees); and

i.  The Court grant such other and further relief as it deems just.

## COUNT II – DEFAMATION PER SE

82. Plaintiff reincorporates and re-alleges the allegations in paragraphs 1 through 81 as if fully set forth herein.

83. Following Ms. Nebel's termination, OCC put up copies of a flyer (attached as Exhibit A) for a seminar entitled "Problem Employees and the Games They Play" with Ms. Nebel's photograph next to the title. The flyer indicates that participants in the seminar will learn how to deal with employees who spread "gossip and rumors."

84. Even though the date of the alleged seminar was in November 2015, OCC continues to display the flyer as of the date of this complaint.

85. There is no continuing purpose for the posting of the flyer other than to embarrass and defame Ms. Nebel.

86. OCC has published and continues to publish the flyer to multiple third parties, such as students and employees, by posting the flyer in multiple public places.

87. When posting the flyer, OCC knew that the flyer's implication that Ms. Nebel is a "problem employee" who spread "gossip and rumors" was false.

88. The flyer and posting of the flyer constitute defamation *per se* against Ms. Nebel.

89. OCC posted (and continues to post) the flyer with actual malice and/or reckless disregard of Ms. Nebel's rights to be free from defamation.

90. The flyer imputes an inability to perform or want of integrity in the discharge of duties of one's office or employment.

91. As a direct and proximate result of OCC's conduct, Ms. Nebel's reputation was destroyed in the area and has contributed to her continuing period of unemployment.

92. Further, Ms. Nebel has been humiliated and has suffered financial loss as a result of the posting of the flyer.

**WHEREFORE**, Ms. Nebel requests judgment in her favor and that:

a. OCC be adjudicated and declared to have engaged in defamation *per se* against Ms. Nebel;

b. Ms. Nebel be awarded economic and non-economic damages to compensate her for the damages she sustained due to OCC's conduct, including compensatory damages for emotional distress;

c. Ms. Nebel be awarded punitive damages in an appropriate amount and as allowed by law; and

d. The Court grant such other and further relief as it deems just.

**A TRIAL BY JURY IS DEMANDED ON ALL COUNTS.**

                                              Respectfully submitted,

                                              JOAN NEBEL

                                              <u>/s/  Jessica Fayerman</u>
                                              One of her attorneys

Jessica Fayerman, 06286140
Fayerman Law, LLC
1 E. Wacker Dr., Ste. 550
Chicago, IL 60601
Tel. (312) 622-0232
jfayerman@fayermanlaw.com